## THE E. LUCKENBACK.[*]

(*District Court, E. D. New York.* February 1, 1883.)

TUG WITH DREDGE IN TOW—NEGLIGENCE IN STARTING SUDDENLY.

    A tug was conducting a tow from New London to Fall River at night. The tow consisted of a dredge with square ends, attached to the tug by a single hawser with a bridle, and nine substantially-empty scows towed by two hawsers attached to corner posts at the rear end of the dredge. As the tow approached Point Judith the hawser from the tug parted and was replaced by two hawsers, the tug stopping for the purpose. When they were out the tug started again; shortly after, the dredge's port rear corner post pulled out and the dredge sank. Her owner filed a libel against the tug to recover her loss. *Held*, upon all the evidence, that the tearing out of the corner post of the dredge was not to be attributed to a defective construction of the dredge, but that the tearing out of the post and the sinking of the dredge were the result of want of due care, on the part of the tug, in starting up again with a sudden jerk, after the hawsers were got out, and there must therefore be a decree for libelant, and order of reference.

In Admiralty.

·*Goodrich, Deady & Platt*, for libelant.

*Butler, Stillman & Hubbard*, for claimant.

BENEDICT, J. This is an action to recover for the sinking of a dredge called the Brooklyn while on a voyage from New London to Fall River in tow of the tug E. Luckenback. The accident occurred in the night-time, when the tug with her tow was approaching Point Judith from the westward. The sea at the time, according to the assertion of the libelant, was heavy and dangerous; according to the assertion of the claimant, smooth. The tow consisted of this dredge attached to the tug by a single hawser with a bridle. Behind the dredge were nine scows substantially empty, towed by two hawsers attached to the dredge. The dredge had square ends. The rear

*Reported by R. D. & Wyllys Benedict.

end, as she was being towed, was constructed with a corner post at each corner, strengthened by knees, and to which the side and end planking was spiked. The top of each of these posts constituted a timber head, constructed for the purpose of being used to make lines fast thereto. On this occasion the two hawsers by which the empty scows were being towed were made fast, one to each of these corner posts of the dredge. "The scows," to quote the words of the captain of the Luckenback, (p. 345,) "were very light, and it was a small digger, and it didn't take a great deal to pull them along." The dredge and scows had been towed from New York to New London by the tug Cyclops. She breaking down, the E. Luckenback went to New London and took her place. The Luckenback started with the tow from New London in the morning, passed through Fisher's Island sound and out into the Atlantic by Watch hill, on her way around Point Judith. As she approached Point Judith, the hawser running from the tug to the dredge parted. It was replaced by two hawsers, the tug stopping for that purpose. Until the two lines were out the tug was worked under one bell; when the two lines were out and taut she was started again. Shortly after there came an alarm from the dredge, and in a very few moments the dredge went to the bottom and was totally lost. The immediate cause of the sinking of the dredge was that the port-corner post, to which one of the hawsers from the scows was attached, pulled out. The question therefore arises as to the cause of the pulling out of this corner post, for if negligence in the management of the tug was the cause, the liability of the tug follows, of course. On the part of the libelant it is contended that the corner post of the dredge was pulled out by negligent management of the tug, in that a savage jerk was given the dredge by the tug when she started up after the two hawsers were made fast. On the part of the claimant it is contended that no jerk was given to the dredge, and that inherent weakness in the dredge was the cause of the pulling out of the corner post. Upon this issue my opinion is with the libelant. Some of the reasons for this conclusion will be briefly stated.

In the first place, attention is called to the fact that the time when the corner post was started from its fastenings is indicated by the crash proved to have been heard by several on the dredge, and not by the cries of alarm made and whistles blown at the time when the corner post was discovered to have gone out entirely. These cries and whistles—being the first notice to those on board the tug of any difficulty—were subsequent to the crash which, before that,

had so alarmed those on the dredge as to cause an examination of the hold to be made with a light. Whether the crashing was caused by the giving way of the bolts and knees of the corner post itself, or by the giving way of some adjacent parts, is not disclosed by the testimony; but there is no room for a reasonable doubt that the breaking of what broke when the first crash was heard was the beginning of the fracture which ended in the going out of the corner post. The inquiry, therefore, is limited to ascertaining the cause of the breaking of the dredge, which was announced to those on the dredge by the loud crash. Proof of the cause of this breaking is found in the testimony as to the time when it occurred, and the behavior of the dredge at that time. Two witnesses from the dredge, who are uncontradicted, testify that the crash on the dredge and the starting up of the tug were simultaneous; and it is also proved by witnesses, likewise uncontradicted, that at the same time a savage jerk was felt on the dredge. This is direct evidence from witnesses who have no interest in this controversy, and are not defending themselves against a charge of negligence on their part, and who speak as to what occurred on their own vessel. The facts so proved by these persons afford satisfactory ground for the inference that the cause of the breaking of the dredge was the action of the tug in starting up after the two hawsers were put out. Indeed, if the statement of the answer that the sea was smooth be taken as true, no other conclusion is possible, inasmuch as the testimony fails to show any other cause than the action of the tug for the breaking of the dredge at that time. But the master, pilot, engineer, and second engineer of the tug say that no jerk was given the dredge, and that the tug was started up easily and with great care. The weight to be given to this testimony from the tug is seriously impaired by the consideration that the pecuniary interest of the master is involved in the inquiry, and also by some other facts stated by the same witnesses to which attention will now be called.

The master of the tug was on her upper-deck aft, at the bell-pull, while the two hawsers were being got out, after the parting of the single line. The tug was stopped, and then worked under one bell until the hawsers were out and taut, then the master, as he says, rang from aft the bell to hook her up. When this signal was given the engineer was leaning out the door of the engine-room, by the throttle. The natural thing for the engineer to do when he heard the bell was to obey the order, and, if he did obey, the testimony from the dredge as to the jerk then felt is confirmed. But the engineer says he did

not obey the bell. The reason he assigns for not obeying is that before he had time to obey the bell the order was modified by a verbal order from the master, who came over the engine-room to give it. The master says that immediately upon pulling the bell he went forward, stamped three times on the deck and called to the engineer, "Don't open her too fast." If this verbal order was given as soon after the ringing of the bell as the master would have us understand, still I doubt its sufficiency as a reason for the engineer's not having obeyed the bell. It seems to me that the bell would have been obeyed before the order could be given at the engine-room; and if it was so obeyed, not only is the evidence from the dredge as to the jerk confirmed, but the action of the master in going to the engineer and calling, "Don't open her too fast," is explained. The testimony affords no other explanation of the master's action.

Again, the second engineer of the tug was tending one of the hawsers as they were put out, and heard the bell when rung by the master. He says that he then ran to the engine-room door to tell the engineer to open her easy; that he started to run while the captain was calling to the engineer, and that the reason he ran was to make it doubly sure. From this testimony it is apparent that after the captain rang the bell something occurred that caused the second engineer to think it all-important that the engine should go easy, and made him run with speed to the engine-room to see that the engine was so handled. If the engineer, standing near the throttle, had opened the engine wide as soon as he got the bell to that effect, the action of the second engineer in running to the engine-room is accounted for, and the testimony of those on the dredge as to the jerk is again confirmed. No other reason for the action of the second engineer is disclosed by the testimony. Some significance may also be attached to the circumstance that the pilot of the tug, who says that he was within hearing of the bell, is very positive that the bell was not rung. But the bell was rung in his hearing; and his testimony to the contrary is suggestive of a belief on his part that the ringing of the bell and an easy opening of the engine are not consistent. In this testimony from the tug I find, therefore, important confirmation of the testimony from the dredge, that a jerk was given the dredge by the tug at the time the dredge was broken.

The conclusion that the breaking of the dredge was caused by a jerk given by the tug is fortified by the testimony respecting the strength of the corner post of the dredge, and the method of its construction. The testimony on this point shows the corner post to have

been sufficiently strong for the purpose to which it was applied on this occasion. It was undoubtedly a strong construction. Up to the time of the tug's starting up it gave no signs of weakness, and caused no uneasiness to those on board the dredge whose lives depended upon its sufficiency to withstand the strain of the scows attached thereto. The weight of the evidence respecting the construction of the dredge, as I find it to be, is therefore adverse to the contention of the claimant—that the tearing out of the corner post should be attributed to a defective construction of the dredge, and confirmatory of the contention of the libelant, that it was caused by a want of due care on the part of the tug in starting up after the hawsers were got out. If further evidence of the sufficiency of the corner post be required, it is found in the fact that it endured the strain of very heavy seas for hours prior to the accident without showing signs of giving way; for, although the answer asserts that the sea was smooth, the testimony proves beyond controversy that after the tow passed Watch Hill a very heavy sea was encountered. There is much testimony to show that this sea was dangerous and unfit for the towing of such craft, and there is also much testimony to show that it was not dangerous, but safe. Whether a way could be found to reconcile the testimony upon this point I do not take time to ascertain. It is sufficient for the view I take of the case to find that the sea was sufficiently heavy to put the strength of the dredge to the proof, and demonstrate its ability to endure any strain to which it could be properly subjected on the occasion in question.

I rest my decision of this case, then, upon the conclusion that the sinking of the dredge was the result of the want of due care on the part of those in charge of the tug in starting her up after the two hawsers had been put out. So viewing the case, it is unnecessary to express my opinion in regard to the other points so ably discussed by the respective advocates. The decree must be for the libelant, with an order of reference to ascertain the amount.